MARGARET D. MANN *et al. vs.* CATHERINE A. MCDERMOTT, *Individually and as Ex'x.*

JUNE 9, 1950.

PRESENT: Flynn, C.J., Capotosto, Baker, Condon and O'Connell, JJ.

O'CONNELL, J. This is a bill in equity in the nature of one for specific performance of an alleged oral agreement. After a hearing in the superior court on bill, answer,

replication and proof, a decree was entered denying and dismissing the bill. The cause is before us on complainants' appeal from that decree.

In substance the bill alleges that Catherine Keenan, late of the city of Pawtucket, deceased, hereinafter sometimes called the testatrix, by her previous statements and conduct from and after 1938, when complainants were married, induced them to abandon their plans for a home of their own, to make their home with her, to assume most of the expenses of a common household, and to undertake repairs and improvements to the real estate involved herein. The inducement upon which the complainants relied was assurances by testatrix that the real estate would in the future belong to them.

The bill seeks relief by establishing a trust or by enforcing specific performance of an alleged oral promise or agreement on the part of testatrix to cause the legal title and ownership in and to a certain parcel of real estate in that city to become vested in the complainant Margaret D. Mann, hereinafter sometimes referred to as Margaret, either by conveyance at some future time after her marriage or in any event after the decease of testatrix by her last will and testament. The bill prays that after the payment of the expenses of administration and debts a trust may be impressed upon said real estate in favor of complainant Margaret D. Mann; that respondent may be declared to be a trustee thereof; that she be ordered to convey the real estate to Margaret, and for other incidental relief.

Catherine Keenan died testate on March 2, 1947. Her will devised the property here involved to the respondent and also named her executrix. The evidence for complainants tends to show that Margaret lived with testatrix from childhood up to the time of her marriage; that although she was not related to her there arose in the course of years a bond of mutual love and affection; that when she discussed the matter of marriage with testatrix the latter told her that she, Margaret, and her husband

could come and live with her, saying: "I am going to give you the house as a wedding present * * * You are the only one that cares for me * * * And that is why I am giving you the house so that you will stay here and live with me and take care of me in my old age. * * * I want you to take over the running of the house and pay all the bills * * * And pay me $5 a week rent."

The evidence for the complainants further tended to show that following the marriage Margaret and her husband went to live with Mrs. Keenan and that on various occasions thereafter the latter said to Margaret: "The house will be yours when I am gone"; that such statement was understood to mean "that in some future time, through a Will, that she would leave the house to me"; that relying on that and other similar statements Margaret and her husband made various improvements to the property both outside and inside; and that it was not until after the death of testatrix that she, Margaret, learned that the property had not been devised to her.

Evidence for the respondent, on the other hand, was to the effect that she was told by testatrix, who was her aunt, that the complainants were living with her temporarily and paying her $5 a week rent until they got on their feet; that in April 1944 her aunt told her that "Margaret and her husband are acting terrible over there. * * * They are just imposing on me. * * * They want to come down and occupy my bedroom. * * * They want to put me in the attic" and that on various other occasions she expressed resentment at their doings in and about the property without her consent and approval.

Respondent's further testimony that testatrix had stated that complainants were only going to live with her a short time until they got on their feet or acquired a home of their own was corroborated by two sisters of the testatrix and also by her niece, a teacher at one of the junior high schools in Pawtucket. These three witnesses also corroborated respondent's testimony that testatrix made complaints in

1943 or 1944 about her treatment by complainants and the way they were using her property without her consent or approval. Practically every witness for both sides described testatrix as a scrupulously honest, deeply religious woman, who had never been known to break her word or fail to keep a promise.

There was much other testimony but it is unnecessary to relate the evidence in further detail. Suffice it to say that it was decidedly conflicting both as to the existence of such oral promise or agreement as claimed by complainants and the extent of the performance of any acts done by them in reliance upon such oral promise or agreement and exclusively referable thereto. While the evidence showed that complainants had spent some money in fixing up and repairing the house, apparently the testatrix never specifically authorized such alterations or repairs or promised to pay for them, and most of these improvements and repairs were in that portion of the house occupied by themselves. Further the sums expended seem minor in comparison to the amounts paid by testatrix over the same period of time. It appears that she paid over $500 to install steam heat, $200 for painting the outside of the house, up to $10 per year for water bills, and annual taxes of $78 until the time of her death.

In his rescript the trial justice held that complainants had not established by clear and convincing evidence their right to the relief prayed for; and that, as to complainant Margaret, whatever acts she performed were not done with exclusive reliance upon any promise or agreement of testatrix.

Where, as in the instant cause, the trial justice has made his decision on conflicting evidence, we cannot disturb such decision unless it is clearly wrong. Complainants contend, however, that the doctrine of "promissory estoppel" is applicable in this cause and that the trial justice failed to apply such doctrine to the evidence therein. The doctrine of promissory estoppel is defined in 1 Rest.,

Contracts, §90, as follows: "A promise which the promissor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Assuming the existence of such doctrine a sufficient answer here is that in effect the trial justice found on conflicting evidence that there was no such promise.

In support of their contention complainants cite among other authorities *Fuller* v. *Mowry,* 18 R. I. 424, *Hobin* v. *Hobin,* 33 R. I. 249, *White* v. *Almy,* 34 R. I. 29, and *Mowry* v. *Dean,* 51 R. I. 156. All these cases are clearly distinguishable from the instant one. *Hobin* v. *Hobin, supra,* was a probate appeal involving a claim against an estate and the others were ordinary actions at law in assumpsit. None of these cases involved the defense of the statute of frauds and therefore proof of the claims asserted therein was required to be established only by a fair preponderance of the evidence, as expressly held in *White* v. *Almy, supra.* These cases do not vary the rule followed consistently by this court that where the statute of frauds would otherwise be a barrier, oral agreements may sometimes be enforced if, by *clear and convincing evidence,* it appears that there has been a substantial part performance and if it is further shown that the acts relied upon to constitute such performance were done in reliance upon the oral agreement and with exclusive referability thereto.

In *Peckham* v. *Barker,* 8 R. I. 17, which was a bill in equity for the specific performance of an alleged oral lease of real property until the death of the respondent or until the property was sold, in dismissing the bill this court said at page 22: "Courts of equity may enforce the specific performance of parol contracts, notwithstanding the statute of frauds, when followed by part performance * * * And, if the contract rests in parol, all its substantial conditions of parties, subject matter, consideration, time, and part

performance, should be established as alleged; and with so much of certainty as to leave no doubt, not only what the terms of the contract are, but that the acts of performance relied upon, whether the entering into possession, the payment of money, or the making of improvements, or all of them, were really done in the faith of the contract, and in pursuance, and only in pursuance thereof. Any rules less strict, would defeat the purposes the statute was designed to accomplish." To the same effect see *Messier* v. *Rainville,* 30 R. I. 161; *Lawton* v. *Thurston,* 46 R. I. 317; *Tillinghast* v. *Harrop,* 63 R. I. 394; *Deatte* v. *Duxbury,* 66 R. I. 1; *Baumgartner* v. *Seidel,* 75 R. I. 243.

After a careful examination of the transcript of testimony and the rescript of the trial justice, we are of the opinion that he followed the correct rule of law in appraising the evidence. We cannot say that he was clearly wrong in his conclusions of fact drawn from such conflicting evidence and therefore his decision should not be disturbed.

The complainants' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Edwards & Angell, John V. Kean,* for complainants.

*Hogan & Hogan, Edward T. Hogan, Edward T. Hogan, Jr.,* for respondent.