DECISION
The contract dispute before the Court was brought by Joseph Saccoccia (hereinafter "plaintiff") against Philips Lighting Company (hereinafter "defendant"). This Court has jurisdiction pursuant to G.L. 1956 §8-2-14.
 Facts/Travel
Defendant is a duly organized corporation with its principal place of business in the State of New Jersey. Plaintiff was employed by defendant as an I/C (Industrial/Commercial) Regional Sales Manager. In 1997, defendant instituted a program referred to as "Project Triangle." Project Triangle involved an agreement between defendant and Philips BGLE G in Europe to assist the latter in eliminating excess inventory of obsolete SLS/RH 20W 120V circuits. Defendant arranged to purchase the excess circuit boards from Philips BGLE G at a discount and then sell finished lamps using the circuit boards to Energy Federation, Inc. (hereinafter "EFI") also at a discount. EFI is an end-user or customer of WESCO Distribution, Inc. of Worcester, Massachusetts (hereinafter "WESCO"). EFI planned to distribute the lamps as samples to end-use customers through utility programs in the Northeast. A purchase order dated August 20, 1997 evidences that this agreement was culminated when defendant sold 194,000 units of SLS20/RH 20W 120V circuit boards to EFI at a cost of approximately $1.4 million. As a result of the sale, WESCO was paid a 3 percent commission. Moreover, the sale was loaded[1] and billed against territory 600.
However, plaintiff and the sales staff working under his supervision had serviced EFI for a period of time prior to the 1997 purchase order. At the time the excess circuit boards were sold, defendant had instituted an "I/C Field Sales Incentive Plan" (hereinafter "Incentive Plan"). The Incentive Plan is a bonus system designed for Region Managers, Business Development Managers, Sales and Senior Sales Representatives-Technical Support, and Sales and Senior Sales Representatives-MDAS, of the I/C Field Sales force. The Incentive Plan "is paid on achievement of goals related to Total Sales Volume and assigned Objectives. The incentive is expressed as a percent of the region's base salary earned on a year-to-date basis." (Incentive Plan at 4.) Each region's performance is evaluated on achievement of assigned goals in three areas: Total Sales Volume-Lamps, Strategic Product Sales Volume and Major Account Sales Volume.[2] The incentive plan is capped for Total Sales Volume-Lamps, which is monitored throughout the year. While the Total Sales Volume-Lamps incentive is paid on a quarterly basis, both the Strategic Product Sales Volume incentive and Major Account Sales Volume incentive are paid on an annual basis at year end.
On August 17, 1997, plaintiff sent C.N. Willingham, Director of Regional Sales Western Region (hereinafter "Willingham"), an e-mail correspondence requesting that his region, region 6110 and territory 6112, receive credit for the $1.4 million sale to EFI. Plaintiff had been informed that the credit would not be applied because the sale was deemed "incremental business." (E-mail from Saccoccia to Willingham of August 17, 1997.) However, plaintiff stated that he was "already loaded for this business." Id. Plaintiff ultimately received a sales credit of $1,000,000 in the total volume sales category, an $800,000 credit in the major accounts category but no credit in the strategic product category. As a result of this credit, plaintiff received a bonus of $28,350.00. Plaintiff argues that the defendant's failure to give him a $1,000,000 credit in the strategic product category caused him to receive $10,078.00 less in his bonus.
Plaintiff brought a timely breach of contract action against defendant. In his amended complaint, plaintiff alleges that defendant has breached its written contract with plaintiff by failing to give plaintiff credit in the strategic product category for the sale to EFI. Also, plaintiff alleges that defendant breached its oral contract to give plaintiff $1,000,000 credit in the strategic product category. Alternatively, the plaintiff contends that the defendant is liable for breach of quasi-contract or under the doctrine of quantum meruit. Plaintiff is seeking damages in the amount of $10,078.00, interest, costs and attorney's fees.
 Breach of Written Contract Claim
Although neither of the parties is claiming that the Incentive Plan is ambiguous, both parties advocate different interpretations of the contract's provisions that determine whether the sale of the SLS20/RH 20W 120V circuits should result in a sales credit to the plaintiff in the strategic product category. Plaintiff asserts that defendant breached its written contract by failing to give plaintiff any credit in the strategic product category for the sale of 194,000 units of SLS20/RH 20W 120V circuits to EFI. Defendant maintains, however, that no breach occurred because the product was sold by the defendant directly to EFI, without intervention by plaintiff, and the product was not the type for which sales representatives would normally receive a sales credit.
The Rhode Island Supreme Court has held that "a contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." Rubery v. Downing Corp., 760 A.2d 945, 947 (R.I. 2000) (quoting Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996)). See alsoD.T.P. v. Red Bridge Properties, 576 A.2d 1377, 1381 (R.I. 1990). It is a well established rule of contract interpretation that "[i]n determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." Id. (quoting Rotelli, 686 A.2d at 94.) The Court has stated that the "construction of ambiguous contract terms is a question of fact." Sea Fare's Am. Cafe, Inc. v. Brick Mkt. Place Assocs., 787 A.2d 472, 476 (R.I. 2001) (quoting Rotelli, 686 A.2d at 95).
In order to establish that there has been a breach of contract, plaintiff must prove by a fair preponderance of the evidence that he complied with his portion of the contract and notwithstanding his compliance, defendant wrongfully breached the contract by failing to give him a sales credit in the strategic product category. See Del Farno v.Aetna Casualty Sur. Co., 673 A.2d 71, 72 (R.I. 1996); Freeman v. DanalJewelry Co., 121 R.I. 321, 324, 937 A.2d 1323, 1324 (1979). This Court finds that the plaintiff has failed to meet that burden.
It is undisputed that the Incentive Plan was "instituted to compensate employees over and above their base salary for the achievement of certain goals and objectives as set forth in the Plan." (Amended Complaint ¶ 9 and Def.'s Answer to Complaint ¶ 9.) At his deposition, Willingham stated that the incentive plan was "designed to affect behavior. That's what it is all about, to drive margin and sales." (Dep. at 40-41.) However, Willingham proceeded to explain that "in the case of Project Triangle, Joe and the sales organization didn't even know about it. I mean, it was over before they even knew what happened. Plus, it didn't impact their numbers." Id. In addition, there are handwritten notations by an employee of defendant on e-mail correspondence from Lynn Esposito to Debra Young that appear to list several reasons why the sale to EFI was never credited to plaintiff's region. (Pl.'s Exhibit 8.) The notations indicate that plaintiff's "region never got credit" for the sale but also reveal that the sale "didn't go to I/C channel-no cannibalization-didn't get to his market." (E-mail of October 13, 1998.) The defendant also asserts that the sale to EFI was made directly by defendant and denies the claim that plaintiff was responsible for obtaining EFI as a customer for defendant. (Def.'s Resp. to Pl.'s First Req. for Admis. at 1 and 3.) Also, in a memorandum regarding distribution of the SLS/RH 20W 120V Lamps, Mitchell Smith, Product Manager CFL-I of Philips Lighting, wrote to Brad Steele of EFI that he "c[ould] not conceive of any way in which this strategy could be construed as potentially `cannibalizing' sales of the SLS RH product line. Exactly the opposite is the case." (Letter of July 21, 1997, at 2.)
Moreover, other record evidence indicates that since the inception of Project Triangle, defendant did not consider the SLS20/RH 20W 120V circuits to be strategic products. The notation "strategic product?" on the e-mail correspondence from Lynn Esposito to Debra Young tends to show that defendant questioned whether the products sold to EFI were strategic products. (Pl.'s Exhibit 8.) The Incentive Plan defines strategic products for 1997 as including Halogen, Mastercolor, CFL, SPEC, Ultralume, and Alto products. The defendant contends that the SLS20/RH 20W 120V circuits sold to EFI, as part of Project Triangle, contained "sub par chips and were labeled `not for resale' and hence differed materially from the ones sold through normal channels." (Def.'s Resp. to Pl.'s First Req. for Admis. at 1.) Willingham stated at his deposition that there was some question as to whether the product sold as part of Project Triangle was a strategic product. (Dep. at 40.) Willingham explained "the product in question was an RH project of the SLS, and I believe the entire SLS family was part of the bonus plan"; however, "there was some reason those circuit boards were not used in the newer products." Id.
Finally, there is a handwritten notation on the e-mail correspondence from Lynn Esposito to Debra Young that queries whether the sale to EFI was a "windfall." In a section of the incentive plan entitled "Program Administration," the defendant discusses windfalls by writing:
 "[a]ny windfall and shortfall situations that significantly impact upon sales or other measurement criteria will be dealt with on an individual basis by management. The Company reserves the right to deem certain designated pieces of acquired business, indirect or direct, as windfalls, i.e. State Contracts/Large Utilities/Big `Bid' Projects, etc., and allow a maximum of 20% of the total sale credit to accrue to territory/region."
Since the Incentive Plan reserved to defendant the right to deal with windfall situations on an individual basis, such as that presented by Project Triangle, the defendant was well within its contractual right to grant plaintiff a sales credit of $1,000,000 in the total volume sales category of the incentive plan, an $800,000 credit in the major accounts category and no credit in the strategic product category. In stark contrast to the various reasons set forth by defendant to establish that there has been no breach of the written contract as evidenced by the Incentive Plan, this Court finds that plaintiff has failed to meet its burden of establishing a fair preponderance of the evidence that the defendant breached its written contract with plaintiff.
 Breach of the Oral Contract
Plaintiff next argues that the defendant orally promised to apply a $1,000,000 credit to the strategic account category for the $1.4 million sale of SLS20/RH 20W 120V circuits to EFI. Defendant denies the existence of any such oral agreement.
The Rhode Island Supreme Court has held that "oral agreements may sometimes be enforced if, by clear and convincing evidence, it appears that there has been a substantial part performance and if it is further shown that the acts relied upon constitute such performance were done in reliance upon the oral agreement and with exclusive referability thereto." Mann v. McDermott, 77 R.I. 142, 146, 73 A.2d 815, 817 (1950).See also, Chamberland v. Goldberg, 89 R.I. 223, 233, 152 A.2d 219, 224 (1959).
In support of his allegation that an oral contract existed between the parties, plaintiff has submitted an undated letter sent to Willingham that purportedly memorializes his conversation with Kathy Kaplan regarding the strategic product bonus payout plaintiff was to receive and the alleged agreement to add a $1,000,000 sales credit on the strategic product category. (Pl's Exhibit 6.) However, during his deposition, Willingham testified that he never responded to this letter. (Dep. at 49.) Instead, Willingham spoke to plaintiff directly and informed him that a decision could not be made about a credit in the strategic product category until the figures for that category were received and evaluated. Id. This claim is supported by Plaintiff's Exhibit 3, a handwritten note, states that the payout for the strategic product category "has not be [sic] determined yet. Payout to strategic area will be May or June of 1998." The numbers for the strategic product category were not received until late in the summer by that point Willingham stated that he
 "couldn't, in good faith, recommend we do anything else because we had already done so much on the volume and major accounts side, and that was an emotional thing. We wanted to send Joe out with as much bucks as we could possibly give him. You know, he was-he was hurt and we wanted to give him those dollars, and that's kind of the way it all played out." (Dep. at 41.)
Both parties have presented evidence to support their contentions regarding the existence of the oral contract. However, as noted above, the existence of an oral agreement must be proven by clear and convincing evidence. The plaintiff has failed to meet this burden. This Court finds from the evidence that there was no oral agreement between the parties whereby the defendant agreed to give plaintiff a credit of $1,000,000 in the strategic product category for the SLS20/RH 20W 120V circuits sold to EFI.
 Breach of Quasi-Contract or Doctrine of Quantum Meruit
Finally, plaintiff argues that the defendant is liable for breach of quasi-contract or under the doctrine of quantum meruit. Plaintiff contends that as a "direct result" of his efforts EFI was a customer of the defendant's distributor WESCO in 1997. (Amend. Compl. ¶ 25.) Moreover, plaintiff maintains that it was through his direct efforts that the excess inventory of SLS/RH 20W 120V circuits was bought by EFI. (Amend. Compl. ¶ 26.) While defendant acknowledges that plaintiff and his sales staff serviced EFI for a period of time prior to the $1.4 million sale, defendant asserts that it sold the excess inventory of SLS/RH 20W 120V circuits "directly" to EFI. (Def.'s Resp. to Pl.'s First Req. for Admis. at 1 and 3.)
It is well-settled that in order for a plaintiff to recover in quasi-contract the various elements that must established are as follows: "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) under the circumstances it would be inequitable to retain such benefit without payment of the value thereof." Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 97 (R.I. 1992) (quoting Hurdis Realty, Inc. v. Town of North Providence,121 R.I. 275, 278, 397 A.2d 896, 897 (1979)). See also, Summer v.Levine, 730 A.2d 33 (R.I. 1999). Thus "to recover on an action in quantummeruit, it must be shown that the owner derived some benefit from the services and would be unjustly enriched without making compensation thereof." National Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985) (citing Montes v. Naismith Trevino Construction Co., 459 S.W.2d 691, 694 (Tex.Civ.App. 1970)).
In the instant case, the plaintiff has failed to establish that his actions brought about the sale of the excess inventory of SLS/RH 20W 120V circuits to EFI thereby conferring a benefit on the defendant. The defendant maintains that the sale to EFI was a direct sale that did not involve the sales representatives within that region. Thus, the plaintiff has f ailed to satisfy the first requirement necessary to allow recovery under a theory of quasi-contract.
 Conclusion
After review of the entire record, this Court finds that the plaintiff has failed to carry his burden in showing that the defendant has breached its written contract with the plaintiff or that the defendant entered into an oral agreement with the plaintiff regarding credit for the sale of excess inventory of SLS/RH 20W 120V circuits. Moreover, this Court finds that the plaintiff has also failed to show that he should recover under a theory of quasi-contract or quantum meruit. Accordingly, judgment enters for the defendant.
Counsel shall submit the appropriate order for entry in accordance with this decision.
[1] In loading, sales representatives are "assigned each year a quota . . . based upon a group of distributors in their trading area, and most of the time that is geographically correct." (Dep. of October 17, 1997, at 22.)
[2] The incentive rates are determined from the region's performance relative to Target for Total Sales Volume-Lamps, Strategic Product Sales Volume, and Major Account Sales Volume as described below.
Measure Rel. Wt. Performance Range
Total Sales 60% Goal Less than 93% 100% 108% or More
Volume-Lamp Payout 0% 15% 30%
Strategic Product 20% Goal Less than 93% 100% 109%
Sales Volume Payout 0% 5% 10%
Major Account 20% Goal Less then 93% 100% 108% or More
Sales Volume Payout 0% 5% 10%