[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This action is before this Court following a trial by jury during which the parties waived their right to a jury trial and agreed to allow the Court to decide their claims without benefit of a jury. Plaintiff Stephen M. Baris seeks, in his complaint, to recover commission payments that he claims are due and owing to him from both defendant Arnold Steinlage and defendant AA Thrifty Services, Inc. Defendant AA Thrifty seeks, by way of its counterclaims, to recover compensatory and punitive damages from plaintiff Baris for alleged tortious interference with contract, tortious interference with prospective business relations, breach of a non-competition agreement, breach of a contractual duty of loyalty, conversion, unfair competition, violation of the Rhode Island Trade Secrets Act, and disparagement or slander. For the reasons set forth in this decision, this Court grants the requested relief in part and denies it in part.
 Factual Background and Procedural History
In early 1998, plaintiff Stephen Baris was employed by David Solomon as a key sales representative with Centredale Sign Co. Darlington Awning and Neon Co. ("Centredale"). He had an employment contract with Centredale that extended from April 15, 1998 through April 15, 1999. Other sales representatives at Centredale at that time included Gary McCoy, Thomas Grenga, Kevin Fortin, and Norman Harkness.
In August 1998, defendant Steinlage, acting on behalf of his new R.I. company, Star Inc., purchased the assets and business of Centredale from its principal, David Solomon. This purchase did not include the employees' employment agreements, although Steinlage agreed to honor the contracts. Steinlage's unspoken goal, at the time of the purchase, was ultimately to sell the Centredale sign business to a direct competitor, George Daubman of AA Thrifty Services, Inc., in January 1999.
In the fall of 1998, Steinlage proposed a new vacation schedule and compensation plan for Star Inc.'s employees, to be effective January 4, 1999. That proposal caused great consternation among the employees. During the fall, Steinlage also encountered problems with the production department, as it was having trouble filling orders placed by the sales representatives. Many employees who were disenchanted with Steinlage sought to blame these problems on his inexperience with the sign business. At that point, Steinlage brought Daubman into the business as a consultant.
In early November 1998, plaintiff Baris advised Steinlage of his intention to leave Star Inc. at the end of 1998. McCoy and Grenga left before the end of 1998 to join a direct competitor of Star Inc., Poyant Sign Company. In December 1998, and on into January 1999, plaintiff Baris claimed that he was due final commission payments. Steinlage told Baris that he did not know the amounts of any commission payments due and owing because he did not yet have the documents that would allow for a determination of any such amounts.
On January 4, 1999, Star Inc. merged into AA Thrifty. Steinlage placed $50,000.00 of the sale proceeds from the merger into escrow pending the resolution of this litigation. During the first few weeks of January 1999, plaintiff Baris was uncertain as to who owned the company. Plaintiff Baris worked at AA Thrifty until January 22, 1999, at which time he left and joined Poyant. Prior to his departure, plaintiff Baris engaged in numerous acts for the benefit of himself and his future employer, at the expense of AA Thrifty, that are discussed more fully by this Court in connection with its adjudication of the defendant's counterclaims.
Plaintiff Baris filed a complaint in February 1999 in the District Court for the State of Rhode Island against defendants Steinlage and AA Thrifty for breach of contract by which he sought to recover monetary damages to compensate him for alleged unpaid commissions in the amount of $7,000.00 and his last week's salary in the amount of $900.00. Defendant AA Thrifty responded by filing an answer and counterclaims against plaintiff Baris for alleged tortious interference with AA Thrifty's prospective contractual relations (Count I), breach of his employment and non-competition contract with AA Thrifty (Count II), conversion of funds belonging to AA Thrifty (Count III), replevin of confidential customer files belonging to AA Thrifty (Count IV), unfair competition with AA Thrifty through diversion of its corporate opportunities to his own benefit and misappropriation of trade secrets (Count V) and disparagement of AA Thrifty to its customers and related customers (Count VI). In its counterclaims, defendant AA Thrifty sought compensatory damages, punitive damages, attorneys' fees, a writ of replevin and temporary and permanent injunctive relief. It also sought to remove the case to the Superior Court on the grounds that its claims for damages exceeded the jurisdictional limit of the District Court. In March 1999, the District Court granted the defendant's request to remove the case to the Superior Court where defendants claimed a trial by jury.
In April 1999, at least two related cases were filed in the Superior Court: Gary McCoy v. Star Inc., Centredale Sign Co. and Darlington Awningand Neon Co., C.A. PC99-1435 (R.I. Super. Ct. filed April 9, 1999); andStar Inc. and AA Thrifty v. Thomas Grenga and Poyant Signs, Inc., C.A. PC99-1532 (R.I. Super. Ct. filed April 21, 1999). These cases arose out of the departure of McCoy and Grenga from Star Inc. and their decision to join Poyant, a competitor of Star Inc. and AA Thrifty, that later employed Baris as well in January 1999. In these cases, AA Thrifty and/or Star Inc. claim, similar to the counterclaims asserted by AA Thrifty in the instant action, that Grenga and McCoy, together with Baris, engaged in unfair competition and misappropriated confidential information and trade secrets for their benefit and that of Poyant during and after their employment with Star Inc.
In May 1999, AA Thrifty filed a motion for a preliminary injunction against Baris in this case to prevent him from engaging in unfair competition. Similar motions were filed on behalf of AA Thrifty and Star Inc. in the related Superior Court cases. While the Court initially assigned the motions for hearing on May 27, 1999 and the Court continued the hearing to another date on at least two occasions thereafter, there is no indication from the court files in any of the three cases that AA Thrifty and Star Inc. ever pressed their motions for injunctive relief, went forward to a hearing or entered into any written stipulations with the other parties regarding their motions. Instead, the parties proceeded with discovery in the underlying civil actions.
In September 2000, defendant AA Thrifty moved to consolidate this case with the other two related cases. The motion calendar justice denied that motion. The other two later filed cases are still pending trial.
In April 2002, the instant case proceeded to trial before a jury, with the parties at that time unwilling to waive a trial by jury. Prior to trial, defendant AA Thrifty, with the agreement of plaintiff, dismissed Count IV of its counterclaim for replevin with prejudice. During the trial, the parties filed cross motions for judgment as a matter of law under Rule 50 at the close of the evidence in the opposing party's case and renewed those motions at the close of all of the evidence in the case. This Court reserved decision with respect to the motions. Following ten days of trial, after it appeared that the parties were not prepared to define the legal theories or the law applicable to them that would allow for proper submission of the case to the jury, all parties agreed, in writing, to waive their right to trial by jury and submit the case to the Court for a nonjury decision. Both parties thereafter filed post-trial memoranda. After review of all of the evidence and memoranda filed in this matter, the case is now ripe for decision.
 PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT
Plaintiff Stephen Baris claims in his complaint that both defendants owe him commissions in the amount of $7,000.00 plus his last week's pay totaling $900.00. Yet based on the evidence adduced at trial, he claims in his post-trial memorandum that he is only owed commissions in the amount of $5,718.00. He makes no claim for salary due and owing, as he introduced no evidence at trial to support such a claim.
As to his claims for commissions due and owing, plaintiff Baris argues that when he terminated his employment with AA Thrifty in January 1999, he still was owed commission monies from the sales he made for Centredale and Star Inc. in 1998. He claims that the commission figures were not computed prior to or after the merger because Steinlage informed him repeatedly that he was still awaiting the final figures and reports. He contends that both defendants are liable to him for commissions due and owing because Star Inc. no longer existed as a separate legal entity following its merger into defendant AA Thrifty in early January 1999. Defendant Steinlage personally assured plaintiff Baris, even after the date of the merger, that he would account to him for all commission monies due and owing to him when the final figures were available to him from his accountant, and defendant Steinlage testified that he held back $50,000.00 from his sale proceeds from the merger of Star Inc. into AA Thrifty pending resolution of certain financial issues connected with this litigation.
According to his post-trial memorandum, plaintiff Baris bases his claims for commissions due and owing on the actual initial invoice date of sale and he accepts defendant AA Thrifty's figures in Exhibits T-1 and T-2 for actual sales and sales invoices in calendar year 1998 and January 1999. He claims that based on those figures, he had gross sales of $454,300.00 during 1998 and up until his departure from AA Thrifty in January 1999. He argues that under his written employment agreement with Centerdale in March 1998 (Exhibit 5), which defendant Steinlage agreed to honor, his sales commissions kicked in after $425,000.00 in sales. Based on his total of $454,300.00 in sales, he claims entitlement to commissions on sales over $425,000.00 (or $29,300.00), calculated at a minimum commission rate of 10%, for a total commission figure of $2,930.00. In addition, he seeks to recover $2,288.76 for his 2% commission override on Kevin Fortin's commission under his employment agreement as set forth in Exhibit T-1. Finally, plaintiff Baris contends that he is entitled to a commission of $500.00 on a $5,000.00 job he sold to Cabot House during this time period for which he could locate no documents in defendant AA Thrifty's accounting records. Thus, plaintiff Baris seeks damages on his claims for breach of contract as against both defendants for commissions due and owing in the total amount of $5,718.00 (consisting of $2,930.00 in commissions for 1998, $2,288.76 in a commission override connected with Kevin Fortin's 1998 sales, and a $500.00 commission on the Cabot House job).
The defendants argue that they are entitled to judgment as a matter of law as to plaintiff Baris' claims for breach of contract. Defendant Steinlage contends that he cannot be liable to plaintiff Baris for commission payments because he never employed plaintiff. He argues further that a verbal agreement to accept the debt of another (as plaintiff Baris claims Steinlage did by agreeing verbally to pay him for any commissions due and owing from Star Inc.) is unenforceable under the statute of frauds. He maintains that liability for commissions due and owing lies, if at all, with defendant AA Thrifty. Defendant Steinlage asks the Court to impose Rule 11 sanctions and award attorneys' fees against plaintiff Baris on the grounds that his contract claims against defendant Steinlage are not only barred as a matter of law but are frivolous and present no justiciable issues of law or fact.
Defendant AA Thrifty acknowledges in its post-trial memorandum that any claims by plaintiff Baris for commissions due and owing are properly directed at it as the surviving entity from the merger with Star Inc. It nonetheless claims that plaintiff Baris cannot prove, based on the evidence adduced at trial, that defendant AA Thrifty breached any contract with plaintiff by failing to pay him commission monies nor can he prove the amount of any commissions due and owing to plaintiff. Defendant Thrifty argues that any commissions on 1998 sales that were due plaintiff Baris before the August 23, 1998 sale of Centredale by David Solomon to Star Inc. were the responsibility of David Solomon and were paid in full by him. See Exhibits M, O, P and Q. It accepts that Exhibits T-1 and T-2 show that plaintiff Baris signed contracts during his dates of employment with Star Inc. after August 23, 1998 totaling $118,952.69 and that his total estimated commissions on those sales would have been $14,715.02. According to defendant AA Thrifty, however, those same exhibits show that, during that same period of employment, plaintiff Baris received payments from Star Inc. totaling $23,096.07, thereby resulting in an overpayment to plaintiff Baris of $8381.15. Defendant AA Thrifty thus seeks judgment as a matter of law against plaintiff Baris on his contract claims.
The 1998 employment agreement that plaintiff Baris signed with David Solomon of Centredale Sign Company Darlington Awning and Neon Company (Exhibit 5) contained a provision regarding the salary and commissions that would be paid to plaintiff Baris. This provision stated as follows:
 Salary: A base salary of $51,000.00 will be paid. Additional commissions will be paid after the equivalent of your base salary is met. This will be based on 12% for new jobs and 10% for repeat business.
Under the plain language of that provision, it appears that plaintiff Baris was to receive a base salary of $51, 000.00 over the course of 1998 with additional sales commissions to be paid at a rate of either 10% or 12% depending on whether the sales he made constituted repeat business or new jobs. The phrase "additional commissions will be paid after the equivalent of your base salary is met" suggests that Centredale only would be obligated to pay Baris commissions over and above his $51,000.00 base salary after plaintiff garnered sales in excess of the amount of sales that would be required to generate that salary if it were paid as commissions on those sales at either a 10% or 12% rate (depending on whether the sale was for new or repeat business). Based on this salary, plaintiff Baris would have a commissions' hurdle ranging from a floor of $425,000 (assuming all of the sales contracts were new sales garnering commissions at a 12% rate) to a ceiling of $510,000 (assuming all of the sales contracts were repeat business garnering commissions at a 10% rate). This interpretation is supported by the language of the prior employment agreements between Centredale and Baris in 1996 and 1997. See
Exhibits 3 and 4. Indeed the 1997 employment agreement established a 12% commissions' hurdle of $367,000.00 based on a salary of $44,000.00. The interpretation is also supported by the reference in the 1998 employment agreement to it being a "contract extension." See Exhibit 5.
The 1998 employment agreement also contained a provision binding plaintiff Baris to a one year non-competition agreement should he leave the company of his own accord prior to the end of the contract. It added, however, that "if there is a change in operational control (i.e., I am no longer in charge of the business), then you will not be held to this agreement."
This 1998 employment agreement remained in full force and effect until Solomon's sale of Centredale to Star Inc. on August 23, 1998. Star Inc. did not buy the employment agreement. Yet it is undisputed that defendant Arnold Steinlage agreed, on behalf of Star Inc., to honor the employment agreement with plaintiff Baris thereafter by promising to continue to pay him salary and commissions in accordance with the contract. Star Inc. thus was obligated, in accordance with the terms of plaintiff Baris' 1998 employment agreement with Centredale, to pay plaintiff Baris any commissions that he earned during 1998 and up until the date of its merger into AA Thrifty in January 1999. Indeed, Steinlage indicated that there would be a settlement at year end as to the difference between the salary draw and commissions. That settlement never occurred as to plaintiff Baris, ostensibly due to the absence of the financial records that would allow for that calculation to be made. According to Steinlage, Ron Reuter, an accountant at Centredale, told him that Baris was owed no commissions as of the end of 1998.
After the merger, defendant Steinlage testified that the responsibility for the payment of any commissions due and owing to plaintiff Baris shifted to AA Thrifty — a fact that defendant AA Thrifty does not deny. It is unclear whether defendant Steinlage made this promise on behalf of defendant AA Thrifty or whether he made it on his own behalf as the repository of escrow monies from his proceeds of the merger that had been segregated at the time of merger to pay any future claims of plaintiff Baris and others to monies due and owing from Star Inc. At a minimum, however, defendant AA Thrifty has agreed in this litigation to pay any monies that this Court finds are due and owing to plaintiff Baris for commissions earned in 1998 and early January 1999.
To establish that a breach of contract occurred, plaintiff must prove, by a fair preponderance of the evidence, that he complied with his portion of the contract and that the defendant wrongfully breached the contract. Del Farno v. Aetna Casualty Surety Co., 673 A.2d 71, 72 (R.I. 1996). "Oral agreements may sometimes be enforced if, by clear and convincing evidence, it appears that there has been substantial part performance and if it is further shown that the acts relied upon to constitute such performance were done in reliance upon the oral agreement and with exclusive referability thereto." Mann v. McDermott, 77 R.I. 142, 146, 73 A.2d 815, 817 (1950) (emphasis in original).
The next question, therefore, is whether plaintiff Baris is owed any commissions from sales in 1998 and January 1999. It is clear from the evidence, which the defendants concede in their post-trial memorandum is undisputed, that Centredale paid plaintiff Baris $40,196.33 in 1998. At a salary of $51,000.00 per annum, as provided in the 1998 employment agreement, this payment figure of $40,196.33 is comprised principally of salary — presumably for 33 weeks at a rate of $980.77 per week for a total of $32,365.09. As the 1998 employment contract between plaintiff Baris and Centredale provided that Baris also would receive an allowance for country club fees and business related expenses (up to $10,000.00) and mileage reimbursement at a rate of 36 cents per mile, this payment figure also presumably included monies for those expenses as well as commission overrides on Fortin's sales provided for by the employment agreement.
There is no evidence, however, that this payment figure also included any commissions for plaintiff Baris' 1998 sales. Indeed, the evidence suggests that Centredale paid plaintiff Baris no commissions on his 1998 sales and in fact owed him no such commissions as of the date of the sale of Centredale to Star Inc. on August 23, 1998. Although there is correspondence from Centredale to Star Inc. in September and October 1998 regarding bonus monies still owed by Centredale to Baris, a Centredale ledger sheet referencing commission payments made to Baris and a check from Centredale to Baris with the notation on it of "comm final" (see Exhibits, M, O, P and Q), there is no evidence that any commissions referenced in these documents were for sales made by Baris in 1998 (as opposed to commissions on his 1997 sales or commission overrides on Fortin's sales). In fact, plaintiff Baris testified that he never received any commission payments for sales he made in 1998.
More importantly, the sales figures for plaintiff Baris for 1998 prove that plaintiff Baris would not have been entitled to any commissions from Centredale on his sales prior to its sale to Star Inc. As of the end of August 1998, plaintiff Baris had total sales for 1998 of $352,402.00 — an amount less than even the $425,000.00 commissions' hurdle that he argues he had to meet before he would be entitled to any commissions.See Exhibit 9. Plaintiff Baris thus has no claim against these defendants that he earned any commission monies in 1998 from his sales prior to the sale of Centredale to Star Inc. on August 23, 1998 or that any such monies remain unpaid.
Yet it is also undisputed that plaintiff Baris generated sales after the sale of Centredale to Star Inc. on August 23, 1998 and during his subsequent periods of employment with Star Inc. and AA Thrifty. Indeed, the Centredale records introduced by the defendants at trial and incorporated by reference into their post-trial memorandum peg those sales at $118,952.69 and plaintiff Baris' estimated commissions on those sales (assuming he met his commissions' hurdle) at $14,715.02. See
Exhibits T-1 and T-2. The estimated total commissions figure of $14,715.02 includes commissions on sales that were repeat business at a 12% rate (totaling $3186.21), commissions on sales that were new business at a 10% rate (totaling $9240.05) and a calculation of the estimated commission override that plaintiff Baris claims he is due on Kevin Fortin's sales during the fall of 1998 (totaling $2288.76 based on Fortin's sales of $114,437.00 at the rate of 2%). Id.
Defendants take the position, based on the Centredale records marked as Exhibits T-1 and T-2, that these commissions are not due and owing to plaintiff Baris because during the time period from August 23, 1998 through early January 1999, Star Inc. made payments to him totaling $18,634.63, AA Thrifty made payments to him totaling $1961.54 and he retained cash from Academy Market in the amount of $2500.00 for total payments made to plaintiff Baris from August 23, 1998 to January 17, 1999 of $23,096.17. Id. Defendants thus claim that plaintiff Baris in fact has been overpaid in the amount of $8381.15 (reflecting the difference between the total amount of payments made to him from August 23, 1998 to January 17, 1999 ($23,096.17) and the total amount of his claimed commissions for that time period ($14,715.02)). Id.
The problem with the defendants' argument, however, is that the $18,634.63 in payments that Star Inc. made to plaintiff Baris in the fall of 1998 and the $1961.54 in payments that AA Thrifty made to him in January of 1999 consisted not of commissions but of salary. The numbers make that clear. A salary of $51,000.00 per annum, as provided by the 1998 employment contract that defendant Steinlage agreed to honor, equals approximately $980.77 per week. At that rate, Star Inc. would have been required to pay Baris a salary of $18, 634.44 for 19 weeks after its purchase of Centredale from Solomon. This salary figure is identical to the amount that Star Inc. did pay Baris (see Exhibit T-1) that defendants now attempt to characterize as commissions. AA Thrifty would have been required to pay Baris $980.77 per week for the time he worked in January 1999. Two weeks pay at that rate is $1961.54 — the exact amount AA Thrifty paid plaintiff Baris in January 1999.
The question thus remains as to whether plaintiff Baris is entitled to commissions on sales from August 23, 1998 through early January 1999 based on his total sales in 1998. He argues, according to Exhibit 9, that the collected deposited funds for his sales for 1998 totaled $499,324.00. He then says that he backed out the accounts receivables for 1997 from that figure and added the accounts receivables for 1999 (while acknowledging that he does not know either of those accounts receivable numbers) to get a total 1998 sales figure for him of $454,300.00, as reflected in Exhibit 13. Plaintiff Baris contends that, based on his agreement with Solomon, his sales commissions kicked in after $425,000.00 in sales. He argues, therefore, that he is owed commissions based on $29,300.00 in sales (the difference between the total 1998 sales figure of $454,300.00 and the commissions hurdle of $425,000.00) at a minimum of 10% under his agreement (assuming, at worst, that all of those sales were for repeat business) for a total sum of commissions due and owing for 1998 of $2,930.00. In addition, he claims, based on the figures contained in Exhibit T-1, that he would be entitled to the minimum sum of $2,288.76 for his 2% commission override on Kevin Fortin's sales under his employment agreement.
Even assuming, arguendo, that plaintiff Baris generated total sales in 1998 of $454,300.00, as he claims, he has failed to prove to this Court that he exceeded the commissions' hurdle dictated by his employment agreement. That hurdle could be as low as $425,000.00 (assuming that all of his sales for 1998 were for new business that would have been calculated at a 12% rate) or as high as $510,000.00 (assuming all of his sales were for new business that would have been calculated at a 10% rate). Knowing that he must use the lower hurdle number to garner the most commissions, plaintiff Baris asks this Court to find that he and Solomon agreed to the lower hurdle figure of $425,000.00. He tries to use his employment agreement with Poyant, which does contain that hurdle figure, to buttress his claim. Yet the existence of such an agreement with Solomon is belied by plaintiff Baris' self-serving testimony to that effect at trial and the absence of any testimony of Solomon. It flies in the face of the signed 1998 employment agreement between the parties. Under the plain language of that agreement, the commissions' hurdle falls in a range, with a $425,000.00 hurdle being the floor and a $510,000.00 hurdle being the ceiling depending on whether the sales are new sales or repeat business. Had the parties intended a hurdle of $425,000.00 regardless of the nature of the sales, they would not have used the language found in the 1998 employment agreement and would have included language such as that found in the 1997 employment agreement (that expressly provided for a 12% commissions' hurdle and stated the $367,000.00 amount of that hurdle).
Given the range of the commissions hurdles that are potentially applicable, to prove entitlement to commissions for 1998, plaintiff Baris must show a breakdown of his 1998 sales into those sales that were new business and those sales that were repeat business. He produced evidence of a breakdown of his sales after August 23, 1998 but he failed to produce evidence of a breakdown of his sales in 1998 for Centredale before the sale to Star Inc. This failure of proof is fatal to his claim for commissions due and owing because this Court has no way to calculate his commissions hurdle. Without knowing the hurdle number, there is no way to determine whether his sales exceeded the hurdle and, if so, by how much so as to determine whether he is entitled to commissions and, if so, in what amount.
Moreover, the breakdown of Baris' sales from September 1998 through January 1999 shows that less than 25% of those sales were for new business. If that same percentage were applied to his total sales figure for all of 1998, he would have had to generate more than $425,000.00 in sales and closer to $490,000.00 in sales to meet his hurdle. His sales certainly fell short of this mark based on his own calculation of a total documented sales figure for 1998 of slightly over $454,000.00.
Perhaps mindful of the deficiencies in the evidence, plaintiff Baris sought at trial to elevate the total sales figures contained in the documents to include sales that he claimed were missing from the defendants' documents. He argued that his sales to Cardi Corp., Cabot House and Philadelphia Sign Co. should have been included in the total sales figures. Yet he could provide no documentary evidence to support his claims in that regard. In addition, there was evidence that the signing of the Cardi contract that would have triggered the sales commission was dated in 1997 rather than 1998 (see Exhibit N) and that the Philadelphia Sign Co. contract (for some unspecified amount) was not executed by him in 1998. He could not provide evidence to support his claim of a signed contract with Cabot House in 1998 and only could estimate the contract price of that undocumented job at approximately $5000.00. His self-serving oral testimony simply is insufficient to prove these additional sales by a preponderance of the evidence, particularly in the absence of corroborating evidence in any of the testimony or sales documentation submitted by the parties at trial.
While it is possible, therefore, that plaintiff Baris is owed commissions for his sales in 1998 and into January 1999, he has failed to prove that it is more likely than not that he is owed any such commissions or the amount of any such commissions. Based on the evidence adduced at trial, he simply cannot prove his claims in this regard for breach of contract.
In addition to commissions on his own sales, plaintiff Baris seeks to recover a commission override on Kevin Fortin's 1998 sales. Although plaintiff Baris' 1998 employment agreement with Centredale, unlike his 1997 and 1996 contracts, does not specifically provide for overrides on sales by Fortin or other salesmen working for him, it does contain language indicating that it is a contract extension. In addition, the 1998 contract contains an override schedule indicating a 2% override on Fortin's sales that land in the range of $0 — 350,000.00, which suggests an agreement between the parties to the contract that plaintiff Baris would receive commission overrides on Fortin's sales in accordance with the schedule and their historical practice. Steinlage agreed to honor any such agreement. Further support for this agreement can be found in the evidence regarding commission monies paid to plaintiff Baris by Centredale in the fall of 1998. See Exhibits, M, O, P and Q. As those payments could not have been for Baris' own sales, as previously determined by this Court, they must necessarily have been for Fortin's sales.
Based on Exhibit T-1, Fortin generated sales for Centredale from August 23, 1998 through approximately the end of the year in the amount of $114,437.00. At a 2% commission override rate, as provided in the 1998 employment agreement, plaintiff Baris would be entitled to a commission override on Fortin's sales, as indicated in Exhibit T-1, of $2288.76. In its post-trial memorandum, the defendants do not dispute that this amount is due and owing.
Accordingly, judgment shall enter for plaintiff Baris for breach of contract as against defendant AA Thrifty in the amount of $2288.76 for commission overrides with respect to Fortin's sales. Judgment shall enter against plaintiff Baris and in favor of defendant Steinlage as to this claim, as defendant Steinlage did not employ plaintiff Baris. Defendant AA Thrifty obtained all of the assets and assumed all of the liabilities of Star Inc. at the time of the merger, the Statute of Frauds could be violated if the debt of Star, Inc. were enforced against this individual defendant, and defendant AA Thrifty has agreed to accept the liability in this litigation for any commissions found to be due and owing to plaintiff. Judgment shall enter against plaintiff Baris and for the defendants as to plaintiff Baris' claims for commissions due and owing with respect to his own sales.[1]
 DEFENDANT AA THRIFTY'S COUNTERCLAIMS Findings of Fact
In September 1998, after the sale of Centredale to Star Inc., plaintiff Baris signed a confidentiality agreement with Star Inc. by which he agreed that he would not distribute confidential information provided to him by Star Inc. with regard to the operation of the business (including information regarding the subcontracting of work and merger discussions). That agreement was valid until January 1, 1999, as Baris stated that he intended to leave Star Inc. by year end. In October of 1998, plaintiff Baris and his fellow salesmen, McCoy and Grenga, were not pleased with the proposed changes in employee compensation that were in the wind at Star Inc. These proposals were presented to them by defendant Steinlage on October 22, 1998. Right after that meeting, plaintiff Baris began negotiating his own employment agreement with Poyant. He also set up the deal with Poyant by which Grenga and McCoy would leave Star Inc. and go to Poyant. These two key employees of Star Inc. (who were each responsible for sales at Star Inc. in 1998 of about $500,000.00) in fact left Star Inc. and joined Poyant in December 1998.
In early January 1999, plaintiff Baris stayed on at Star Inc. and then at AA Thrifty ostensibly in an effort to garner his commissions that he claimed were due and owing. When defendant Steinlage kept indicating that he did not yet have the documentation to determine the amount of those commissions, plaintiff Baris got angry. On January 4 or 5, 1999, plaintiff Baris approached Steinlage in the truck bay manufacturing area of AA Thrifty and said that he was holding the final payment ($2500.00) from Academy Market on a $5000.00 sale he had made to it in the fall of 1998 to make sure that he got paid his commissions. Steinlage asked Baris to turn over that money and Baris refused. He still retains that corporate payment today.
Plaintiff Baris, by his own admission, actually worked for AA Thrifty and Poyant at the same time. He signed an employment agreement with Poyant on January 19, 1999. It gave him a signing bonus of $5000.00, $1000.00 for "setting up the deal that brought Tom [Grenga] on board" and "$1000.00 for Gary [McCoy]." Yet Baris worked at AA Thrifty through January 22, 1999. Complaint, paragraph 5.
Plaintiff Baris never told Daubman that he was going to leave AA Thrifty until January 21, 1999. Even at that time, he did not tell Daubman that he was leaving to join a direct competitor. When Daubman walked out that day with Baris, he noticed that Baris was carrying approximately 30-35 job folders in his briefcase and 4-5 job folders in his hands that appeared to be active (with a contract number and date of contract). Job folders, according to Steinlage's testimony, are like gold. They contain all of the historical account information for Centredale customers that is necessary to quote repair and maintenance work and new sign sales, information as to active product requests and quotes needed for sales calls as well as the essential contact information and data needed to call on customers and prepare proper invoicing and billing. The information is confidential; although competitors might have some idea of the customer's names, the job folders contain information about the nature of the sign work done for the customer and its value and volume.
Daubman saw Baris go back into the building. Daubman called Lisa Carr and told her to keep an eye on Baris because he had just given his notice. She saw him at his computer for awhile before he left with a briefcase with approximately 25-40 files in it that appeared to her to be older Centredale files, as opposed to AA Thrifty files. Baris left that day and never returned.
Before he left AA Thrifty, plaintiff Baris, again by his own admission, copied files belonging to AA Thrifty and took them with him when he left the company to join Poyant. He saw nothing wrong with doing so. He did not know how many files he copied but admitted that an intern at AA Thrifty copied the job folders for him. He copied materials from the files for completed jobs for "his clients" with whom he had done business for years, including DB Mart, Blockbuster and Newport Creamery. He tried to deny that he made the copies to assist him in his new job at Poyant, but he could not explain why he copied the folders other than to say that he was simply in "panic mode." He denied taking any original job folders with him. He said that he kept the copied files for a number of months but ended up throwing away the copies of the "old jobs" that he had made after he realized that he would not use them.
Daubman testified that, after Baris left, they never found the job folders for DB Mart, Blockbuster, Newport Creamery and Heritage Consulting and they thought a great many more job folders were missing. There was no system for determining how many files were missing and why. If the missing job folders or sales documents were for new clients or new business garnered by Baris but taken with him to Poyant, there would be no way for AA Thrifty to determine the names on those accounts or the nature of the information taken unless they learned it from the client.
During the first week in January 1999, plaintiff Baris had a conversation with Stephen McGinn, another salesman from AA Thrifty. He told McGinn that when a sale was taking place, the quote file on the job belonged to the salesman who had quoted the job and that it was the property of the salesman and not the company that employed him. He added that when a salesman leaves a company, he could take all of his quote files with him. Baris further testified that he made many contacts in the last several weeks of December and January before he left AA Thrifty — approximately 142 as evidenced by his claims for mileage reimbursement. He could not estimate the number of those contacts with whom he was involved in active negotiations for sign sales, but he estimated that at least seven of those contacts ultimately turned into sales for Poyant.
Around January 12, 1999, McGinn, an AA Thrifty employee, made a sales call on Ralph Conti, the owner of Raphael's, with whom he had done business in the past. He had a scheduled appointment with Conti at 1:00 p.m. When he got there, Conti wondered why he was there because McCoy (now at Poyant) has just been there and told Conti that he (McCoy) was covering McGinn's sales call because McGinn could not make it. McCoy left his Poyant business card with Conti. Someone inside AA Thrifty had to have tipped off McCoy about the potential sale to Rafael's. The sale then went to Poyant. A reasonable inference can be drawn from the evidence adduced at trial that Baris, while employed by AA Thrifty, is the insider or was directly the insider who funneled this work to McCoy at Poyant. After all, it was Baris that assisted McCoy in securing employment with Poyant after they became disenchanted with Star Inc. and the proposals for employee compensation. It was McCoy who Baris would soon join as an emplooyee at Poyant.
Plaintiff Baris also admitted that he took with him to Poyant a sale to Heritage Consulting Group that he made for AA Thrifty. Judith Lecuivre of Heritage Consulting had called the company that she knew as Centredale (then Star Inc.) to order a new sign, as her company had previously done business with Centredale, and was told that her prior salesman had left the company and that another salesman would get back to her. A week or two later, plaintiff Baris called her, gave her his pager number and insisted that she return the call only on his pager. He asked her for copies of the previous work orders, as he said he could not find her file. He sought mileage reimbursement for a supposed visit to Heritage during the week of January 11, 1999 but testified at trial that he only dealt with the company over the phone. On January 26, 1999, he then gave her an estimate for the job that was on Poyant letterhead. When she questioned that letterhead, Baris told her that his company had changed its name. She then accepted the estimate and gave Poyant a deposit for a new sign.
When Heritage did not receive the sign that Baris had promised, Ms. Lecuivre repeatedly tried to contact Baris on his pager. By then, AA Thrifty had taken back his pager and he did not receive her calls. She finally called Poyant at the number on the letterhead and reached Baris who told her that he had left his old company because it was going out of business. At trial, he admitted that it would have been wrong to suggest to her that Centredale had gone out of business. Ms. Lecuivre then called the company she knew as Centredale (AA Thrifty) and was told that it was not going out of business.
Outraged, Heritage then cancelled the order from Poyant, but did not receive its deposit back. After it made demand on the President of Poyant for return of the deposit, it ultimately received that deposit. Baris later sent Ms. Lecuivre a fax that apologized for misrepresenting himself and the company for whom he worked. He called her after he sent the fax to try to find out how she figured out what was going on and she declined to have further dealings with him. Heritage ultimately ordered its sign from AA Thrifty on February 25, 1999 for $421.58, which was delivered and paid for on March 24, 1999. The Heritage story is memorialized in a 1999 sworn statement that Ms. Lecuivre gave to Richard Cleary, a retired FBI agent that AA Thrifty hired soon after Baris joined Poyant to determine the extent of plaintiff Baris' acts of unfair competition.
In addition to Heritage, Baris visited Casual Lifestyles in early January 1999, as the company had inquired about purchasing a sign, and he sought mileage reimbursement in connection with that visit. He took a deposit of $2800 (in the form of a check from Casual Lifestyles made payable to Poyant) toward a sign purchase by Casual Lifestyles from Poyant on January 20, 1998, prior to his departure from AA Thrifty. The quote for that job that Baris prepared for Casual Lifestyles is dated January 20, 1998 and appears on Poyant letterhead. It references the names of two AA Thrifty employees, Norm and Ron (controller), and the fax number for AA Thrifty. Poyant is the payee on the deposit check of that same date from Casual Lifestyles. The total sale for that job was $5915.00.
Prior to his departure from AA Thrifty, plaintiff Baris also wrote an undated letter to "all of his loyal customers" with whom he had done business at Centredale, Star Inc. and AA Thrifty to let them know that he would be "severing [his] relationship with Centredale" and opening up a Rhode Island branch for Poyant. See Exhibit C. It indicated that he had sold the Darlington Sign Co. six years ago to Solomon and stayed on to teach him the sign business. He then stated in the letter that, in August 1998, Solomon had sold out to Star Inc. — "a person with no industry experience" — and then merged the company with AA Thrifty on January 1, 1999. Plaintiff Baris wrote further that `[d]ue to instability and other reasons that I will not mention, many of the key employees have already quit the company." He noted that he had given his resignation and that, effective immediately, he will no longer have any involvement with the company. Finally, he stated that "[t]here will be no interruption of service and pricing will remain intact."
This litigation ensued. Baris sought his commissions and AA Thrifty sought to recover damages for all of his misconduct that harmed.
 Tortious Interference with Contractual Relations (Count I)
Defendant AA Thrifty argues that plaintiff Baris tortiously interfered with the employment contracts between his co-employees and Star Inc. (now AA Thrifty). They contend that the plaintiff caused McCoy and Grenga to leave Star Inc. to work for a competitor and that this action was an unjustified interference with Star Inc.'s rights under those contracts. Plaintiff Baris responds that both McCoy and Grenga resigned on their own accord because of their dissatisfaction with the company. Plaintiff also maintains that there is no evidence that the plaintiff influenced their ultimate decision to leave the company.
Interference with a contractual relationship is an action sounding in tort. D'Andrea v. Calcagni, 723 A.2d 276, 278 (1999). A prima facie case of tortious interference with a contractual relationship requires proof of (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. Jolicouer Furniture Co., Inc. v. Baldelli,653 A.2d 740, 752 (R.I. 1995) (citing Smith Development Corp. v. BilowEnterprises, Inc., 308 A.2d 477, 482 (R.I. 1973)). A defendant who intentionally and improperly interferes with a plaintiff's rights under a contract with another person is subject to tort liability "if the interference causes the plaintiff to lose a right under the contract or makes the contract rights more costly or less valuable." JolicouerFurniture Co., 652 A.2d at 752 (citing W. Page Keeton, et al., Prosserand Keeton on the Law of Torts, § 129 at 978 (5th ed. 1984)). In a cause of action for intentional and malicious interference with a contractual relationship, the term "malice" does not mean that proof is required of a defendant's spite or ill will towards the contracting party or parties. Jolicoeur, 653 A.2d at 753. Rather, "legal malice — an intent to do harm without justification — will suffice." Id.
(quoting Mesolella v. City of Providence, 508 A.2d 661, 669-70 (R.I. 1986)).[2] After the plaintiff establishes the four prima facie elements, the burden then shifts to the defendant to prove a justification for the interference. Belliveau Bldg. Corp. v. O'Coin,763 A.2d 622, 627 (R.I. 2000).
In this case, plaintiff Baris set up the deal with Poyant by which Grenga and McCoy left Star Inc. and went to Poyant. That fact is memorialized in the employment agreement between plaintiff Baris and Poyant. As a reward for his efforts in this regard, Poyant gave Baris a $1000 commission for each of the two employees that he brought on board for Poyant.
There is insufficient evidence, however, that McCoy and Grenga had contracts of employment with Star Inc. at the time Baris engaged in discussions with Poyant that led to its employment of McCoy and Grenga. They were employees at will, as Steinlage purchased no employment agreements from Centredale and entered into no such agreements with the salesmen thereafter. As such, they were free to leave Star Inc. at any time and were not the subject of any contracts with which Baris could have interfered.
In addition, the evidence at trial is insufficient to prove that Baris intentionally interfered with any employment contracts or obligations that Grenga and McCoy may have had with Star Inc. These employees were disenchanted with the change in management at Star Inc. and the proposed changes to employee compensation and were looking to leave. The testimony of Baris and McCoy at trial suggests that Grenga and McCoy decided on their own to leave Poyant and that Baris did not cause their relocations. Giving Baris the credit for making the deal that led to their employment at Poyant, as suggested by the language of Baris' employment agreement with Poyant, does not prove that but for his efforts, McCoy and Grenga would not have left Star Inc. As such, defendant AA Thrifty cannot prove that plaintiff Baris is liable on defendant's counterclaim for tortious interference with contractual relations.
 Prospective Business Advantage
Defendant AA Thrifty argues that plaintiff Baris also tortiously interfered with AA Thrifty's prospective business relationships and anticipated contracts with clients. Specifically, defendant argues that plaintiff unjustifiably interfered with the business relationships AA Thrifty had with both Heritage Consulting Group and Casual Lifestyles. The plaintiff responds that, with respect to Heritage, AA Thrifty ultimately obtained that sign job and all resultant profits. With respect to Casual Lifestyles, the plaintiff responds that Casual Lifestyles' owner wanted to do business with the plaintiff because of the lengthy personal relationship between the plaintiff and the previous owner of that company. Plaintiff also argues that, out of the hundreds of accounts that he handled at Centredale, Star Inc. and then AA Thrifty, defendant could proffer evidence only as to these two accounts.
Rhode Island recognizes a cause of action for interference with prospective business advantage. Mesollella v. City of Providence,508 A.2d 661 (R.I. 1986). "One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Id. at 669 (quoting Restatement (Second) Torts, § 766B at 20 (1979)). The elements of this claim are (1) the existence of a business relationship or expectancy; (2) knowledge by the interferor of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damages to the plaintiff. Id. The plaintiff must prove that the defendant acted with legal malice, which is defined as the intent to do harm without justification. Id. at 669-70. The burden then falls on the defendant to demonstrate a justification for its actions. Id. at 670. Unlike claims of interference with contractual relations, claims of interference with prospective business advantage do not require plaintiff to prove the existence of a valid contract, but it must establish either that "but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." Id. at 671.
There is no question in this case that plaintiff Baris intentionally and improperly interfered with the prospective contractual relationship that AA Thrifty had with Heritage. Heritage contacted Star Inc. and then AA Thrifty (the companies it knew as Centredale) to order a sign, as it had done prior business with Centredale and wanted to do business again. Plaintiff Baris, through his ruse, diverted that business opportunity to himself at Poyant. He intentionally caused Heritage not to enter into a contract with AA Thrifty and prevented AA Thrifty from getting that business in the first instance by inserting himself as the contact person at Star Inc. and AA Thrifty with whom Heritage should do business, delaying AA Thrifty's quote for the job until he got to Poyant, quoting the job on Poyant letterhead, misrepresenting to Heritage that Poyant was a different name for the same company that Heritage had originally contacted and accepting a deposit on the job for Poyant. Plaintiff Baris intended to harm AA Thrifty without legal justification, as he could offer no explanation for actions that were clearly designed to benefit Poyant and him at the expense of AA Thrifty. Indeed, he took the view that the Heritage business did not belong to AA Thrifty, but instead belonged to him.
But for plaintiff Baris' improper interference, Heritage would have accepted the quote from and given its deposit to AA Thrifty rather than Poyant. This conclusion is buttressed by the fact that AA Thrifty ultimately made the sale to Heritage for the sign in question after it learned of Baris' fraudulent dealings with it, albeit after a delay caused by Baris and much angst surrounding his actions.
There also is no question in this case that plaintiff Baris intentionally and improperly interfered with the prospective contractual relationships that AA Thrifty had with Casual Lifestyles. Casual Lifestyles contacted Star Inc. or AA Thrifty to order a sign. Plaintiff Baris, while employed at AA Thrifty and holding himself out as a salesman for AA Thrifty, visited Casual Lifestyles and sold that company a sign. Rather than prepare the quote for that job from AA Thrifty, however, he put the quote on Poyant letterhead and took a deposit from Casual Lifestyles prior to his departure from AA Thrifty. Plaintiff Baris, again through his ruse, diverted that business opportunity that belonged to AA Thrifty to himself at Poyant. He intentionally caused Casual Lifestyles not to enter into a contract with AA Thrifty and prevented AA Thrifty from getting that business in the first instance by inserting himself as the contact person at Star Inc. and AA Thrifty with whom Casual Lifestyles should do business, quoting the job and accepting a deposit for the job for Poyant, misrepresenting to Casual Lifestyles that Poyant was AA Thrifty, taking the job with him to Poyant and completing the job at Poyant in exchange for payment from Casual Lifestyles in the full amount of the contract price. Plaintiff Baris intended to harm AA Thrifty without legal justification, as he entered into a contract with Casual Lifestyles on behalf of Poyant at the same time that he was was an employee of AA Thrifty and held himself out to that company as such an employee. Plaintiff Baris could offer no explanation for his actions (other than attempting to suggest, with no corroborative evidence, that Casual Lifestyles wanted to do business with him whether he was at AA Thrifty or Poyant). His actions were clearly designed to benefit Poyant and him at the expense of AA Thrifty. Indeed, he took the view that the Casual Lifestyles business did not belong to AA Thrifty, but instead belonged to him.
But for plaintiff Baris' improper interference, this Court finds that Casual Lifestyles would have accepted the quote from and given its deposit to AA Thrifty rather than Poyant and ultimately would have secured its sign from AA Thrifty in exchange for full payment of the contract price. This conclusion is buttressed by the fact that plaintiff Baris, knowing that he would leave AA Thrifty in another day or two, nonetheless made sure (unlike with Heritage) that he made the quote and secured the deposit from Casual Lifestyles for Poyant before he left AA Thrifty so as to lock Casual Lifestyles into the deal with Poyant after his departure from AA Thrifty.
As such, plaintiff Baris is liable to defendant AA Thrifty with respect to its counterclaims for intentional interference with prospective contractual relations as to Heritage and Casual Lifestyles.
 Breach of Contract (Count II) The Non-competition Agreement
Defendant AA Thrifty contends that plaintiff Baris' 1998 contract extension, which was to be in effect from April 15, 1998 through April 15, 1999, included a non-competition agreement as set forth in a 1992 non-competition agreement between DSS (Solomon) and Baris. They argue further that plaintiff Baris agreed in the 1998 employment agreement that if he were to leave Centredale on his own accord prior to the conclusion of the contract term, he would not compete for an additional year from the date of separation. Defendant AA Thrifty maintains that, as a matter of law, the 1992 non-competition agreement was in effect at the time of separation pursuant to the 1998 contract extension and that the Plaintiff breached this agreement when he directly competed against Centredale as an employee of Poyant. In the alternative, the defendant argues that any ambiguity in the 1998 contract extension should be construed against plaintiff Baris because, as drafter of the contract, he is responsible. Plaintiff Baris responds that his 1992 non-competition agreement with DSS Communications (Solomon) expired in 1997 and that he negotiated and signed a new contract with Solomon in 1998. The 1998 contract, he argues, released him from any further obligation under the non-competition agreement when Solomon gave up control and ownership of the business.
When the terms of a contract are ambiguous, a court properly exercises judicial construction of the document. W.P. Assocs. v. Forcier, Inc.,637 A.2d 353, 356 (1994). If the court finds that the contract terms are clear and unambiguous, it will apply the agreement as written. Id.
(citing Aetna Casualty Surety Co. v. Graziano, 587 A.2d 916, 917 (R.I. 1991)). To determine whether an agreement is clear and unambiguous, the court will review the agreement in its entirety and give its language its plain, ordinary, and usual meaning. Id. (citing Antonev. Vickers, 610 A.2d 120, 123 (R.I. 1992)). The Rhode Island Supreme Court has consistently found that a contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation. Id.
(citing Gustafson v. Max Fish Plumbing Heating Co., 622 A.2d 450, 452 (R.I. 1993)). Extrinsic evidence is admissible to help interpret a contract susceptible to more than one interpretation. Id. (citing Nelsonv. Ptaszek, 505 A.2d 1141, 1143 (R.I. 1986)).
Because non-competition agreements are not favored, "they are subject to judicial scrutiny and will be enforced as written only if the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." Durapin, Inc. v. Amer.Prods., Inc. 559 A.2d 1051, 1053 (R.I. 1989). "When considering the validity of a non-competition agreement, the crucial issue is reasonableness, and that test is dependent upon the particular circumstances surrounding the agreement." Id. With respect to reasonableness,
 [w]hether a restrictive covenant is reasonable is ultimately a question of law to be determined by the court. Before a court reaches this question, however, the party seeking to enforce a non-competition provision must show that (1) the provision is ancillary to an otherwise valid transaction or relationship, such as an employment contract . . . (2) the provision is supported by adequate consideration, and (3) there exists a legitimate interest that the provision is designed to protect." Id. (Citations omitted).
In 1998, plaintiff Baris and David Solomon, on behalf of Centredale, entered into an employment agreement for the period from April 15, 1998 through April 15, 1999 See Exhibit 5. By the terms of that agreement, Baris agreed that, if he left the company of his own accord before the end of the contract term, he would be bound by an agreement not to compete (contained in the 1992 non-competition agreement between the parties) for a period of one year from the date of separation.
When Solomon, on behalf of Centredale, sold the company to Star Inc. in August 1998, however, he did not assign the 1998 employment agreement to Star Inc. nor did Star Inc. purchase that agreement. As of August 23, 1998, therefore, the 1998 employment agreement ceased to have any legal effect.
Even had the 1998 employment agreement been assigned to or purchased by Star Inc., plaintiff Baris would not have been bound by its non-competition provisions as of the date of the sale of the business from Centredale to Star Inc. in August 1998. The 1998 agreement specifically relieved Baris of his non-competition agreement upon a "change in operational control." Id. The sale of Centredale to Star Inc. ended Solomon's operational control of the business and, by extension, ended Baris' contractual obligation not to compete.
Although defendant Steinlage, on behalf of Star Inc., told Baris after its purchase of Centredale that he would continue to honor the 1998 employment agreement, that promise meant that Star Inc. would continue to pay Baris the salary, commissions and benefits outlined in that agreement. There was no evidence adduced at trial, however, that Star Inc. and Baris discussed or agreed to a continuation of the non-competition agreement contained in the 1998 employment agreement as a condition of the payment of salary, commissions and benefits or otherwise. Absent proven mutuality of obligation, the terms of the non-competition agreement contained in the 1998 employment agreement cannot be said to have survived the sale of Centredale to Star Inc.
Moreover, even if the 1998 employment agreement (and its non-competition provisions) could be found to have survived that sale and remained in effect after the subsequent merger of Star Inc. into AA Thrifty, the terms of the agreement again would have relieved Baris of his obligation not to compete upon the next change in operational control when, after the merger, Daubman took over operational control of the business. As such, this Court finds that there was no contractual non-competition agreement between AA Thrifty and Baris in effect at the time that Baris left the company on January 22, 1999. To the extent, therefore, that defendant AA Thrifty premises its counterclaim for breach of contract on the 1998 employment agreement, and the 1992 non-competition agreement referenced therein, that claim must be denied.
 Duty of Loyalty
Defendant AA Thrifty also premises it counterclaim for breach of contract on a claim that plaintiff Baris breached his contractual duty of loyalty to Star Inc. and AA Thrifty by soliciting their customers for his own benefit and that of Poyant while still in their employ. Plaintiff Baris responds that his efforts on behalf of Star Inc. accounted for $36,793.00 in gross sales in December, 1998, after he had given notice of his termination, and that this fact does not evidence a breach of the duty of loyalty.
Employees owe a duty of loyalty to their employers. Rego Displays v.Fournier, 379 A.2d 1098, 1101 (1977). Knowledge of the identities of an employer's customers, coupled with an appreciation of their specific needs, form the basis of the employer's trust. Id. at 474. Solicitation of an employer's customers while still in its employ constitutes a breach of that trust. Id. Moreover, the Rhode Island Supreme Court has held that an employee who maintained customer information records not readily available from public sources and who spent the better part of his final days of employment at a copy machine reflected disloyal conduct constituting a breach of employer confidence. Abbey Med./Abbey Rents,Inc. v. Mignacca, 471 A.2d 189,193 (R.I. 1984).
"[T]he malicious inducement of an employee to terminate an existing employment to enter the employment of another gives rise to a cause of action and the fact that the contract of employment is terminable at will does not bar recovery." ABC Transnational Transport, Inc. v. AeronaudicsForwarders, Inc., 413 N.E.2d 1299, 1305-6 (Ill. 1980). An employee "breaches the fiduciary trust if he solicits his employer's customers, appropriates his employer's personality, or entices co-workers away from his employer." Id. at 1306.
There is no question in this case that plaintiff Baris breached his contractual duty of loyalty to defendant AA Thrifty. He actively solicited customers of Centredale/Star Inc./AA Thrifty for his personal benefit and that of Poyant while still employed by AA Thrifty. His activities in this regard were particularly egregious as to the Heritage Consulting account because he traded on Centredale's goodwill by soliciting that company's business and securing a deposit on the job for Poyant while he was still employed at AA Thrifty (and indeed claiming and getting paid mileage reimbursement from AA Thrifty while doing so), while at the same time intentionally misrepresenting to the customer that he was affiliated with Poyant. Once confronted, he tried to retain the business for Poyant by disparaging AA Thrifty — telling the customer that Centredale had gone out of business — and by not returning the deposit that the customer ultimately would use, once returned, to pay for a contract with AA Thrifty.
His actions were similarly egregious as to the Casual Lifestyles account. He again traded on Centredale's goodwill by soliciting that company's business for Poyant and indeed securing a deposit for Poyant while he was still employed by AA Thrifty (and again getting paid mileage reimbursement for doing so), while misrepresenting to the customer that he was affiliated with Poyant. Unlike Heritage, Casual Lifestyles never learned of the misrepresentation and that sale and its proceeds went to Poyant and not to AA Thrifty.
Plaintiff Baris also assisted from the inside at AA Thrifty in helping a competitor of AA Thrifty, namely Poyant, solicit business that Poyant would not have known about but for his employment at AA Thrifty. There is no other logical explanation for McCoy's sales call to Rafael's on behalf of Poyant ahead of McGinn, in which McCoy postured as McGinn's co-employee, after that call was set up between Rafael's and McGinn for the benefit of AA Thrifty.
Plaintiff Baris also wrote many of AA Thrifty's customers before he joined Poyant and not only informed them of his impending departure from the company but disparaged AA Thrifty in an effort to garner business for himself at Poyant. He copied company records of AA Thrifty that he viewed as "his clients" and took them with him to Poyant upon his departure from AA Thrifty. It is more likely than not that he also took original job folders and quotes from AA Thrifty with him when he left his employment there, as he viewed quotes as his own personal property, job folders were missing after he left, he was observed carrying out dozens of original Centredale file folders upon his departure and he admitted that several of the customers that he had contacted on behalf of AA Thrifty before he left ultimately did business with Poyant. He also withheld corporate funds of AA Thrifty after his departure. Furthermore, he set up the deal with Poyant that brought Grenga and McCoy to Poyant while he was an employee of Star Inc.
As such, plaintiff Baris breached the fiduciary trust that Star Inc. and AA Thrifty, as his employers, reposed in him. In so doing, he breached the contractual duty of loyalty that he owed to Star Inc. and AA Thrifty, as his employers. Plaintiff Baris is thus liable to defendant AA Thrifty for breach of the contractual duty of loyalty that he owed to Star Inc. and AA Thrifty.
 Conversion (Count III)
Defendant AA Thrifty claims that plaintiff Baris converted Centredale funds to his personal use. It argues that the plaintiff Baris, through his employment with Star Inc., came into possession of a $2,500.00 payment from Academy Market for a sale he had made to that company on behalf of Star Inc. and wrongfully refused to turn those monies over to his employer. Plaintiff Baris responds that AA Thrifty has no legal right or standing to assert a claim for conversion for the Academy Market funds because it is not entitled to them. Plaintiff does not dispute that he is holding the Academy Market funds but, rather, claims that he intended to deliver them to Steinlage once AA Thrifty paid him his commissions. Plaintiff maintains that Steinlage accepted this arrangement, but that neither Steinlage nor Star Inc. ever transferred or assigned its rights to those funds to AA Thrifty. Plaintiff argues that even if AA Thrifty has a right to this claim, it has failed to meet its burden of proving criminal intent on the part of the plaintiff.
"The gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession."DeChristofaro v. Machala, 685 A.2d 258, 262 (1996) (quoting Fuscellarov. Indus. Nat'l Corp., 368 A.2d 1227, 1230 (1977)). "The determining question is whether the defendant has appropriated to his or her own use the chattel of another without the latter's permission and without legal right." Id. (quoting Terrien v. Joseph, 53 A.2d 923, 925 (1947)). To sustain an action for conversion, a plaintiff must prove ownership or possessory interest in the property at the time of the conversion. Id. at 263. Money, where specifically identifiable, can be the subject matter of an action for conversion where the defendant is under an obligation to deliver specific money to the plaintiff. Id.
In this case, plaintiff Baris engaged in an unlawful act of conversion with respect to the Academy Market funds. He took those monies lawfully to begin with, as the funds were entrusted to him as a result of his employment as a salesman for Star Inc. He then converted those funds to his own use by failing to convey them to Star Inc. and then AA Thrifty, as his employment required. In fact, to this day, plaintiff Baris has not returned or sought to return the funds. He has converted the funds to his own use in an attempt to force the defendants to pay him the commissions that he claims are due and owing to him. Yet he has no claim that he is owed any monies for commissions out of the sales monies from Academy Market. If he is owed any commissions, then AA Thrifty would pay them, not out of the Academy Market funds that he is holding but out of general corporate funds. He still would be forced to return the Academy Market monies to AA Thrifty, as he has no legal claim or right to those funds.
This Court must conclude, therefore, that plaintiff Baris took the Academy Market funds belonging to Star Inc. without its consent and exercised dominion over those funds in a manner inconsistent with Star Inc.'s right to possession of those monies. Plaintiff Baris is thus liable to defendant AA Thrifty with respect to its counterclaim for civil conversion of the Academy Market funds.
 Unfair Competition (Count V)
Defendant AA Thrifty further asserts counterclaims against plaintiff Baris for unfair competition. It argues that the plaintiff is liable under the common law because he abused his position at Star Inc. and AA Thrifty and, both before after he terminated his employment there, damaged the company by using confidential customer information. Defendant further asserts that plaintiff's misappropriation of its confidential information violated the Uniform Trade Secrets Act, R.I. Gen. Laws section 6-41-1 et. seq.
Plaintiff Baris responds that the customer lists and related documents of AA Thrifty were neither "trade secrets" under the Uniform Trade Secrets Act nor was there a valid or enforceable non-competition agreement between the parties that would cause the customer lists to be treated as trade secrets. The identity of the customers is determinable through regular business channel. In addition, plaintiff argues that there was no misappropriation other than with respect to Heritage and Casual Lifestyles.
 Common Law
Misuse of an employer's confidential information by an employee or former employee constitutes unfair competition. Abbey Medical/AbbeyRents, Inc. v. Mignacca, 471 A.2d 189, 193 (R.I. 1984); Rego Displays,Inc. v. Fournier, 119 R.I. 469, 474 (1977). That the employer can protect itself through a non-competition agreement after the employment terminates, and fails to do so, does not render the use of the confidential information by a former employee less an abuse of confidence. Colonial Laundries, Inc. v. Henry, 48 R.I. 332, 339 (1927). Knowledge of the identities of an employer's customers and an appreciation for their specific needs forms the basis of an employer's trust. That relationship between the employer and employee takes on the nature of a trade secret when it is appropriated to the employee's private use. Rego, 119 R.I. at 474.
A protectable interest in customer lists is recognized "only if that list is confidential in nature, or if the promisor has become aware of the specific and otherwise unknown needs of a non-confidential list of customers, such that a special relationship is formed between the promisor and the customer. Durapin, Inc. v. Amer. Prods., Inc., 559 A.2s 1051, 1057 (R.I. 1989) (citations omitted). The question of whether a customer list justifies protection is ultimately one of law. Id.
However, where the identity of customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts do not accord to the list the protection of a trade secret. Id. A list of people who have already purchased a product is substantially more valuable than a list of people who only might be interested in purchasing the product. Id. An exception to the general rule is when the business activities involved resemble more those of a traveling salesperson than those of a route carrier.
Confidential information includes knowledge of the names of an employer's customers furnished to an employee. Colonial, 138 A. at 48. "[A]bsent any enforceable non-competition agreement, former employees . . . can solicit their previous employer's customers for business, as long as, in doing so, they are not acting tortiously, for example, by interfering unjustifiably with their former employer's contracts, by misappropriating the employer's trade secrets, or by converting other confidential business information belonging to their former employer."Long v. Atlantic PBS, Inc., 681 A.2d 249, 253 (1996) (citing Callahan v.Rhode Island Oil Co., 240 A.2d 411, 413-14 (1968)).
For all of the reasons that this Court outlined in finding plaintiff Baris liable for breach of his duty of loyalty to Star Inc. and AA Thrifty, it likewise finds him liable for unfair competition. He improperly misappropriated and used the confidential information of his employer during and after the course of his employment to benefit his own competitive interests and those of Poyant. He did not simply use a customer list to contact customers of AA Thrifty after his departure that he would have known about in the general marketplace notwithstanding his prior employment there. He used the confidential information that he acquired during the course of his employment with Centredale, Star Inc. and then AA Thrifty (including customer inquires, quotes, contact information, information about the customer's needs, the relationship with a customer, deposit monies and information from job folders) to solicit customers of Star Inc. and AA Thrifty, directly and indirectly, both before and after his employment with Poyant, to benefit himself and Poyant. He also copied confidential information from job folders and took it as well as quotes and job folders with him when he left AA Thrifty. In addition, he helped a direct competitor of AA Thrifty, namely Poyant, secure two of its key employees and disparaged AA Thrifty to its customers.
As such, it is clear that plaintiff Baris engaged in acts of unfair competition. He misappropriated confidential information belonging to AA Thrifty and used it, on behalf of himself and Poyant, to compete unfairly with AA Thrifty, in violation of the common law.
 Uniform Trade Secrets Act
The Uniform Trade Secrets Act, codified in R.I. Gen. Laws § 6-41-1
et. seq., provides relief for the misappropriation of a trade secret. The Act defines "trade secret" as:
 . . . information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
 (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
 (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
R.I. Gen. Laws § 6-41-1(4).
The Act defines "misappropriation" as:
 (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
 (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who:
 (A) Used improper means to acquire knowledge of the trade secret; or
 (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
 (I) Derived from or through a person who had utilized improper means to acquire it;
 (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
 (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; . . .
R.I. Gen. Laws § 6-41-1(2). Furthermore, the Act provides that "[i]mproper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy. . . ." Id. §6-41-1(1).
The acts of plaintiff Baris that constitute a breach of a duty of loyalty and unfair competition likewise support a finding of liability under the Uniform Trade Secrets Act. The confidential information of AA Thrifty (including customer inquires, quotes, contact information, information about the customer's needs, the relationship with a customer, deposit monies, information from job folders and the job folders themselves) constitute trade secrets under the Act. This information does not exist in the public domain, is subject to reasonable efforts by AA Thrifty to maintain its secrecy, and would be economically valuable to a competitor in the marketplace such as Poyant.
Plaintiff Baris misappropriated this information by disclosing or using it, without the consent of AA Thrifty, at a time when he knew that he had acquired the information under circumstances giving rise to a duty to maintain its secrecy or limit its use to his employment with AA Thrifty. He misappropriated the information through improper means, including acts of theft, misrepresentation and outright breach of his contractual duties to maintain its confidentiality.
As such, plaintiff Baris is liable under the Uniform Trade Secrets Act, R.I.Gen. Laws section 6-41-1 et. seq., for misappropriation of trade secrets.
 Disparagement (Count VI)
Although defendant AA Thrifty asserted a counterclaim against plaintiff Baris for disparaging it to its customers, it did not argue disparagement or defamation in its post-trial memorandum nor did it suggest therein that it is entitled to damages for this claim. This Court already has dealt with the fact of disparagement in its rulings on the other counterclaims asserted by the defendant and is of the view that those rulings adequately account for the alleged disparagement claimed by the defendant. As such, defendant AA Thrifty's counterclaim for disparagement is denied.
 Damages
Defendant AA Thrifty argues that it is entitled to compensatory damages, nominal damages, and punitive damages. By way of compensatory damages, the defendant contends that plaintiff Baris should pay the $2,500.00 in sales proceeds that he retained from Academy Market; $240 of net profit loss from the Casual Lifestyles job; $53.82 (two months interest at $26.91 per month) for the loss of use of the Heritage Consulting deposit; and $52,000.00 as loss of net profits for 1999 (4% net profit for AA Thrifty in 1999 × ($1.9 million in profits in 1998 minus $600,000 in profits in 1999)). (Alternatively, the defendant argues that the plaintiff should be responsible for 25% of the loss of net profits in 1999 because he averaged 25% of Centredale's sales.)
Furthermore, the defendants argue that the plaintiff is responsible for the expenses AA Thrifty incurred to recover from his disloyal acts, amounting to $34,000.00 (50% of Daubman's time as AA Thrifty's President at his 1999 annual salary of $40,000.00 plus 50% of AA Thrifty's Controller's time at his 1999 annual salary of $28,000.00). The defendant also argues that the plaintiff, as a disloyal employee, should be made to return $5,884.62 to AA Thrifty, representing the salary he received during his period of disloyalty ($980.76 × 6 weeks). See BBF, Inc.v. Germanium Power, 430 N.E.2d 1221 (Mass. App. Ct. 1982) (trial judge "reasonably determined that [the employer] was entitled to recover the salaries paid to [the disloyal employee] during the period of disloyalty." Defendant further argues that it is entitled to damages under R.I. Gen. Laws § 9-1-2 for the plaintiff's crimes of conversion, embezzlement, larceny, and false pretenses. In this regard, defendant AA Thrifty contends that plaintiff Baris is guilty of 1) embezzlement and fraudulent conversion pursuant to R.I. Gen. Laws §11-41-3 because he retained the Academy Market payment; 2) obtaining property by false pretenses, pursuant to R.I. Gen. Laws § 11-41-4, because he deceived Judy Lecuivre of Heritage Consulting into believing that he was an agent of Centredale when, in fact, he was acting on behalf of Poyant; and 3) larceny, pursuant to R.I.Gen. Laws § 11-41-1, because he stole the $2,500 payment from Academy Market, took a deposit from Heritage Consulting that was intended for AA Thrifty, and took file folders and active quotes when he left his job at AA Thrifty. Plaintiff also seeks punitive damages as to all of his claims under common law and the Uniform Trade Secrets Act.
Plaintiff Baris responds that there is no evidence of willful or malicious misappropriation that would justify punitive damages under the Trade Secrets Act. He further argues that punitive damages are not recoverable in the present case under the common law because his actions do not reach the criminality standard he maintains is applicable here.
Compensatory damages are awarded to attempt to restore an injured party to the position it was in prior to a loss caused by a wrongdoer's misconduct. Such damages must be established with reasonable certainty and cannot be speculative.
Lost profits have long been recognized as a proper element of compensatory damages in Rhode Island in cases of business interruption.Abbey Medical/Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 195 (1984). The basic requirement for the recovery of lost profits is that such loss be established with reasonable certainty. Long v. Atlantic PBS, Inc.,681 A.2d 249, 252 (R.I. 1996). Though mathematical certainty is not required, the factfinder "should be provided with some rational model of how the lost profits occurred and on what basis they have been computed."Id. "[T]he bottom line should be the injured party's net lost profits after expenses are deducted and before taxes are calculated." Id. Lost profits are a function of two variables: (1) the dollar value of the contracts diverted from the plaintiff to another and (2) the plaintiff's profit margins if it had obtained these contracts. See Long, 681 A.2d at 252. The measure of damages is the loss to the plaintiff, not the gain to the defendant. Id. (citing Psaty Fuhrman, Inc. v. The HousingAuthority of Providence, 68 A.2d 32, 38 (1949)). One of the ways of establishing a loss of profits is by showing the past history of a successful and profitable operation of the business. Smith DevelopmentCorp., 308 A.2d at 482. However, an aggrieved party "has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages." Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016, 1026 (R.I. 1998) (citing Bibby's Refrigeration, Heating AirConditioning, Inc. v. Salisbury, 603 A.2d 726 (R.I. 1992)). The defendant has the burden of proving by affirmative evidence that the plaintiff failed to mitigate damages. Bibby's Refrigeration, 603 A.2d at 729. Where the defendant's conduct causes uncertainty with respect to a damages, that uncertainty will not bar a judgment for damages. Story ParchmentCo. v. Paterson Co., 282 U.S. 555, 568 (1931).
"Damages for conversion are measured by the fair market value of the property at the time it was converted." Goodbody Co., Inc. v. Parente,358 A.2d 32, 33 n. 2 (1976).
Rhode Island General Laws § 9-1-2 allows civil damages for crimes and offenses. It provides:
 Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made; and whenever any person shall be guilty of larceny, he or she shall be liable to the owner of the money or articles taken for twice the value thereof, unless the money or articles are restored, and for the value thereof in case of restoration.
To be entitled to relief under § 9-1-2 for larceny, the plaintiff must establish in the civil action the defendant's guilt of the crime of larceny by proof either of a conviction or of an admission of guilt in a prior prosecution. Ludwig v. Kowal, 419 A.2d 297 (R.I. 1980).
"The Restatement (Second) of Torts states that nominal damages may be awarded in situations where compensatory damages are too speculative. Nominal damages are properly awarded when, although the claimant shows significant harm, its amount is not proved with sufficient certainty to entitle him to an award of compensatory damages. This is true if the defendant has damaged or converted property, the value of which cannot be ascertained or has not been shown." Colortronics v. Plastic Controls,Inc., 668 F.2d 1, 10 (1st Cir. 1981).
The Rhode Island common law rule for imposing punitive damages is rigorous and will be satisfied only in instances where the defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages. Palmisano v. Roth, 624 A.2d 314, 318 (R.I. 1993). "[T]he party seeking punitive damages has the burden of producing evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality. . . ." Id.
Punitive damages are an extraordinary sanction and are disfavored in the law. Id. The Uniform Trade Secrets Act, however, expressly provides for exemplary damages for willful and malicious appropriation. R.I. Gen. Laws § 6-41-3. Section 6-41-3 provides:
 Damages. — (a) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.
 (b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice an award made under subsection (a).
Therefore, the Supreme Court has held that "in the case of a violation of the Trade Secrets Act, punitive damages are available for conduct that is willful and malicious and need not rise to the level of criminality."McFarland v. Brier, 769 A.2d 605, 611 (R.I. 2001).
Section 4 of the Uniform Trade Secrets Act provides for an award of attorney's fees in cases where willful and malicious misappropriation exists. R.I. Gen. Laws § 6-41-4. An award of attorney's fees rests with the sound discretion of the trial justice. Rhode Island Insurers'Insolvency Fund v. Leviton Mfg. Co., Inc., 763 A.2d 590, 598 (R.I. 2000). A trial justice exercises discretion in determining "whether the proffered fees are reasonable and whether the . . . work performed was a necessary element in the proceeding." Schroff, Inc. v. Taylor-Peterson,732 A.2d 719, 721 (R.I. 1999).[3]
In this case, there is no question that defendant AA Thrifty is entitled to compensatory damages for plaintiff Baris' acts of tortious interference with prospective contractual relations (Count I), breach of his contractual duty of loyalty (Count II) and unfair competition and violation of the Uniform Trade Secrets Act (Count V) as it pertains to his dealings on behalf of himself and Poyant with Heritage and Casual Lifestyles while he was employed by AA Thrifty. But for his wrongful conduct, defendant AA Thrifty would have retained the Casual Lifestyles sale and received sale proceeds from the Heritage job two months sooner. As such, defendant AA Thrifty is entitled, with respect to all of these counts, to an award of compensatory damages of $240.00 for its lost profits on the Casual Lifestyles job and $53.82 (two months interest at $26.91 per month) for its loss of use of the Heritage deposit monies.
The balance of acts of breach of loyalty and unfair competition for which this Court has deemed plaintiff liable under Counts II and V of defendant's counterclaims (including his misappropriation of confidential information through the copying of records and leaving with quotes and job folders of AA Thrifty, his use of some of that information for Poyant after his departure, the Rafael's sales call, his setting up the deal for two key employees of Star Inc. to go to a direct competitor and his disparagement of AA Thrifty in letters to its clients) caused significant harm to defendant AA Thrifty that cannot be measured with enough precision to avoid an award of speculative damages. Its claim for lost profits is simply too speculative. It failed to present sufficient evidence from which this Court could compute the dollar value of its lost sales resulting exclusively from plaintiff's diversion of business to Poyant or of its profit margins had it obtained that business. Its task in this regard was made virtually impossible given the departure of other key employees, the recent sale of the company and then merger, the chaotic state of its relevant business records, its investigator's inability to confirm additional damages, and Baris' denials.
It also failed to prove, with reasonable certainty, the expenses it incurred (or the President's and controller's salary equivalents) in attempting to deal with the aftermath of Baris' misconduct. In addition, it failed to show that it took reasonable steps to mitigate its claimed damages for lost profits and expenses through the pursuit of injunctive relief.
An award of nominal damages in lieu of proven compensatory damages certainly can be justified in these circumstances. Yet such an award, in this Court's view, would not adequately compensate defendant AA Thrifty for these other acts of misconduct that plaintiff Baris committed while he wore two hats of employment: the Star Inc./AA Thrifty hat and the Baris/Poyant hat. Certainly Baris should not be able to profit from his salary at AA Thrifty when he was working also for its competitor. It seems reasonable, therefore, to compensate defendant by compelling plaintiff to return all of the salary he earned at Star Inc. and AA Thrifty during the six weeks of his disloyalty — for a total of $5,884.62. This amount, too, can serve as a reasonable royalty under the Uniform Trade Secrets Act for plaintiff's misappropriations.
Defendant AA Thrifty is also entitled to an award of compensatory damages in the amount of $2500.00 under Count III of its counterclaims for conversion of the Academy Market funds. That figure represents the fair market value of the property converted at the time of its conversion.
Plaintiff's retention of these funds, however, cannot be deemed to be larceny so as to entitle defendant AA Thrifty to double damages under R.I. Gen. Laws section 9-1-2 nor can it be deemed to be criminal fraudulent conversion. The crime of larceny under R.I. Gen. Laws §11-41-1 and the crime of fraudulent conversion under R.I. Gen. Laws § 11-41-1 both require proof, beyond a reasonable doubt, of an intention to permanently deprive another person of property. There is insufficient evidence in this case to find such intent on the part of Baris with regard to his retention of these sales proceeds because he told Steinlage at the time and again at trial that he was retaining them until he got paid his commissions. It is reasonable to conclude from this evidence that plaintiff did not intend to permanently deprive the defendant of the Academy Market funds but intended only to retain the monies until he got his claim for commissions paid or resolved. Moreover, double damages cannot lie under R.I. Gen. Laws § 9-1-2
where the plaintiff was not convicted of and did not plead guilty to larceny. As such, there is not such evidence of criminality as to warrant an award of punitive damages with respect to defendant's counterclaim for conversion.
An award of punitive damages can be justified, however, under the common law and the Uniform Trade Secrets Act with respect to plaintiff Baris' found conduct of tortious interference with AA Thrifty's prospective contractual relations regarding the Heritage and Casual Lifestyles accounts, breach of loyalty, unfair competition and violation of the Uniform Trade Secrets Act. His misdeeds were all willful and malicious, designed to further his own financial self-interest and that of Poyant and its employees while harming AA Thrifty.
While double damages cannot be imposed on plaintiff for larceny under R.I. Gen. Laws § 9-1-2 because plaintiff was never convicted of larceny, he committed offenses in the nature of larceny by taking away corporate opportunities, proprietary and confidential information and funds with the intent to permanently deprive AA Thrifty of those items and to use them to help himself and Poyant while doing further harm to AA Thrifty. In addition, the evidence conclusively suggests that he committed the crime of obtaining money under false pretenses under R.I. Gen. Laws § 11-41-4, in violation of R.I. Gen. Laws § 9-1-2. He obtained money from Heritage for himself and Poyant that Heritage intended to be delivered to AA Thrifty by personating an AA Thrifty salesman or falsely representing himself to be an agent of AA Thrifty.
Baris' actions in this regard were willful, reckless and malicious so as to amount to criminality. His actions cry out for punishment and deterrence consistent with the common law. These acts also deserve to be punished under the Uniform Trade Secrets Act in an amount not exceeding twice that awarded in compensatory damages for violation of the Act. As such, this Court will award defendant AA Thrifty punitive damages under the common law and the Uniform Trade Secrets Act with respect to those claims contained in Counts I, II, and V of its counterclaims on which this Court has found liability, in the total amount of $7500.00. Defendant AA Thrifty is also awarded a reasonable attorney's fee under that Act.
 CONCLUSION
For the reasons set forth in this decision and in accordance therewith, judgment shall enter for plaintiff Baris and against defendant AA Thrifty as to his complaint for breach of contract in the amount of $2288.76 for commission overrides on Kevin Fortin's sales; all other claims for breach of contract against AA Thrifty for commissions due and owing are denied and dismissed. Judgment shall enter for defendant Steinlage as to all of plaintiff's claims for breach of contract in his complaint. Defendants' claims for attorney's fees with respect to plaintiff's complaint are denied.
Judgment shall enter in favor of defendant AA Thrifty and against plaintiff Baris as to: the claim for tortious interference with prospective contractual relations contained in Count I of its counterclaim; the claim for breach of loyalty contained in Count II of its counterclaim; the claim for conversion contained in Count III of its counterclaim; and the claims for unfair competition and violation of the Uniform Trade Secrets Act contained in Count V of its counterclaim. As to all of these claims, compensatory damages are awarded to defendant AA Thrifty totaling $8,678.44, plus interest, and punitive damages are awarded to defendant totaling $7500.00. Defendant AA Thrifty is also awarded a reasonable attorney's fee under the Uniform Trade Secrets Act. All others claims of the defendant (including Count I (tortious interference with contract); Count II (breach of non-competition agreement); Count IV (replevin); and Count VI (disparagement)) are denied and dismissed. Counsel shall confer and present an agreed upon form of order and judgment that is reflective of this decision.
[1] This Court declines, however, to sanction plaintiff under Rule 11 or award the defendants attorneys' fees in connection with plaintiffs' breach of contract claims. While most of plaintiff's contract claims against the defendants lack merit, this Court cannot state that they presented no justiciable issues of law or fact. They involved justiciable factual and legal issues regarding construction of the plaintiff's employment agreement and plaintiff's entitlement to contract damages. While judgment on plaintiff's contract claims lies only against defendant AA Thrifty, this Court cannot say that assertion of that claim against the individual defendant was frivolous in light of the merger, the personal representations he allegedly made to plaintiff about payment of commissions, and his testimony about an escrow fund that he maintained connected with disputed issues in this litigation.
[2] In Belliveau Bldg. Corp. v. O'Coin, the Rhode Island Supreme Court noted the seven factors provided in the Restatement (Second) Torts § 767 that courts should weigh in determining whether the interference was unjustified: "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interests with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship." 763 A.2d 622, 628 n. 3 (2000).
[3] In determining whether an attorney's fee is reasonable, the factors to be considered include the following:
 "1. the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
 2. the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
 3. the fee customarily charged in the locality for similar legal services;
 4. the amount involved and the results obtained;
 5. the time limitations imposed by the client or by the circumstances;
 6. the nature and length of the professional relationship with the client;
 7. the experience, reputation, and ability of the lawyer or lawyers performing the services; and
 8. whether the fee is fixed or contingent." Supreme Court Rules of Professional Conduct, Article V, Rule 1.5.